IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SCARLETT & ASSOCIATES, INC., :
:
Plaintiff, :
:         CIVIL ACTION NO.
vs. :
:         1:05-CV-0145-CC
BRIARCLIFF CENTER PARTNERS, :
LLC, et al., :
:
Defendants. :

## OPINION AND ORDER

This matter is before the Court on Defendant Faison & Associates, LLC's Motion for Summary Judgment [Doc. No. 151], Plaintiff's Motion for Leave to Amend Complaint [Doc. No. 160], Third-Party Defendants' Combined Motion for Summary Judgment [Doc. No. 161],[1] and Plaintiff's Cross-Motion for Partial Summary Judgment [Doc. No. 164]. For the reasons stated herein, the Court **GRANTS in part** and **DENIES in part** Defendant Faison & Associate, LLC's Motion for Summary Judgment [Doc. No. 151], **DENIES** Plaintiff's Motion for Leave to Amend Complaint [Doc. No. 160], **GRANTS in part, DENIES in part,** and **DENIES AS MOOT in part** Third-Party Defendants' Combined Motion for Summary Judgment [Doc. No. 161], and **DENIES** Plaintiff's Cross-Motion for Partial Summary Judgment [Doc. No. 164].

## I.    FACTS

This action arises from environmental contamination at a commercial property in DeKalb County, Georgia (the "Property"). Third-Party Defendants Roy S. Tuggle and Virginia E. Tuggle (the "Tuggles") are the current owners of the Property, and the Tuggle family has owned the Property since 1921, along with

---

[1]      The claim against Third-Party Defendant Patricia Chatham has been resolved and dismissed. Accordingly, the portion of the summary judgment motion addressing the claims asserted against Patricia Chatham is moot.

much of the surrounding property. On December 31, 1965, the Tuggles executed a lease with C & A Land Company, also known as C & A Properties, Inc., ("C & A") granting to C & A the right to the use, occupation, and extensive control of the Property. As fee simple owners of the Property, the Tuggles retain certain control over the Property under the terms of the referenced lease. As amended on February 16, 1996, March 17, 1970, and April 25, 1966, the lease runs through March 13, 2019, with automatic renewal options for an additional 47 years.

As part of the distribution of the estate of C & A's principal, R. Pierce Chatham, Plaintiff Scarlett & Associates, Inc. ("Scarlett") assumed all property rights under the lease on January 6, 1995. Scarlett was incorporated on December 28, 1994, for the sole purpose of holding the interest to the Property under the lease. Scarlett, as C & A's "heir and successor in interest," controls the Property and has assumed C & A's liabilities. Scarlett's interest in the Property remains its sole asset.

The Property consists of two areas of concern. The area that remains of concern in this litigation is a strip mall known as Briarcliff Station Shopping Center (the "Shopping Center"), where a dry cleaning business operated. There were several owners and operators of the dry cleaning business between 1986 and 2007:

(a)  Defendants Retail Centers, Ltd. and Briarcliff Station Associates, Ltd. leased the Shopping Center from C & A beginning in 1986, and sublet the dry cleaner space to Defendant SHS Equipment Sales, Inc. ("SHS").

(b)  SHS operated the dry cleaning business from 1986 to 1992.

(c)  In 1992, Atlanta Enterprises, Inc., owned by Defendant Mohammad M. Ali, took over the dry cleaning business under the trade name Regal Custom Cleaners.

(d)  In 1995, after Defendant Briarcliff Station Associates, Ltd. failed to make payments to its lender, AmSouth Bank of Florida ("AmSouth"), Scarlett leased the Shopping Center directly to AmSouth.

(e)  In May 1997, AmSouth renewed Atlanta Enterprises' lease for the dry

cleaner space.

(f)     In September 1997, AmSouth sold the Shopping Center Ground Lease to Defendant Briarcliff Center Partners, LLC.

(g)     In October 1998, Defendant Briarcliff Center Partners, LLC sublet the dry cleaner space to Defendant Aslam Mohammad, who continued dry cleaning operations until July 2007.

Contamination at the Property was discovered in the early to mid 1990s as a result of a series of environmental investigations performed in association with the administration of the estate of R. Pierce Chatham. The Property was held in trust by NationsBank while the estate was tied up in litigation from 1989 to 1994. During that time period, NationsBank hired an environmental consultant, PSI, to initiate an environmental investigation of the Property for purposes of its administration and distribution under the estate. The investigations revealed the Property was contaminated with tetrachloroethene, commonly known as "PCE," which is the primary cleaning solvent used by dry cleaners, as well as other hazardous substances and constituents. Based on the results of the investigation, on June 27, 1994, NationsBank, on behalf of C & A, issued a Release Notification for the Property as required under the Georgia Hazardous Site Response Act ("HSRA"). In November 1994, NationsBank, on behalf of C & A, again notified the Georgia Environmental Protection Division ("GEPD") of the contamination. All of these actions occurred prior to Scarlett's assumption of the lease of the Property on January 6, 1995.

The date of the original release of PCE is unknown.[2] However, as mentioned

_____

[2]     Defendant Faison & Associates, LLC objects to this statement of fact on the ground that the evidence cited by Scarlett in support of the statement, the Affidavit of Charles H. MacPherson, Jr., is inadmissible due to the lack of personal knowledge of Mr. MacPherson. Indeed, in response to several statements set forth in Scarlett's Statement of Additional Material Facts, Faison contends that both the expert report and affidavit of Mr. MacPherson are inadmissible due to lack of personal knowledge. However, this Court

above, a dry cleaning facility has been in operation on the Property since 1986. According to the environmental investigations, the PCE was released from both surface discharge in and around the dry cleaning operations inside the Shopping Center and from surface disposal outside the Shopping Center from the dry cleaning operations. The impacted soils are located directly beneath the dry cleaning unit, waste storage area, and water valve boxes outside and behind the building. A PCE groundwater plume was identified and is associated with the impacted soils at the dry cleaning facility. The PCE plume has been continually migrating and expanding. Operations at the dry cleaning facility through 2007 resulted in continued releases of PCE on the site.

On April 10, 1996, GEPD placed the Property on the Georgia Hazardous Site Inventory ("HSI"). Since assuming the lease from C & A, Scarlett has undertaken a series of response and investigation actions on the site from 1996 to the present day, including submission of Compliance Status Reports (including revisions) ("CSRs") and a Correction Action Plan ("CAP") to remediate and address the PCE contamination on the site. Even so, beginning in December 1997, GEPD notified the legally responsible parties, including Scarlett, of their liability for the contamination, and in several instances ordered responsible parties to investigate and remediate the contamination.

GEPD's actions against the responsible parties are summarized as follows:

(a)  On December 30, 1997, GEPD notified Scarlett and the Tuggles that they are responsible for the contamination.

---

previously has held that personal knowledge may arise from a review and understanding of documents related to the case. See Hallmark Developers, Inc. v. Fulton County, No. 1:02-cv-01862-ODE, 2007 WL 2819519, at *1, 9-10 (N.D. Ga. Sept. 27, 2004). Because Mr. MacPherson's statements and opinions are based on his review of the environmental investigation reports and his extensive knowledge in this area, the Court finds that Mr. MacPherson's report and affidavit are based on his personal knowledge and that the report and affidavit are therefore admissible.

(b)     In 1998, GEPD entered an Administrative Order against Scarlett requiring completion of the CSR and implementation of a CAP.

(c)     On November 5, 1998, GEPD notified Defendants Briarcliff Center Partners, LLC and Mohammad M. Ali that they are responsible for the contamination.

(d)     On May 3, 1999, following Scarlett's submission of an Abbreviated CSR in February 1999, GEPD ordered Scarlett and the Tuggles to take certain actions to address the contamination.

(e)     On June 2, 1999, GEPD entered into a Consent Order with Defendant Briarcliff Center Partners, LLC under which it was required to take certain actions to address the contamination.

(f)     On December 6, 1999, GEPD identified Michelin North America Inc. and Retail Centers, Ltd. as responsible parties.

(g)     On January 19, 2005, in an enforcement action, GEPD sought a $50,000 penalty against Scarlett for its failure to comply with the Administrative Order.  A similar action was brought against the Tuggles contemporaneously.

(h)     On August 18, 2005, GEPD and Scarlett entered into a Consent Order, pursuant to which Scarlett agreed to undertake and complete investigation, remediation and clean-up of the site.

In accordance with the Consent Order entered into by Scarlett and GEPD, Scarlett submitted a CAP, which GEPD approved on June 13, 2006. (More recently, the CAP was amended to address changed conditions and was once again approved by GEPD; corrective action is currently being implemented on the site.) Within the Consent Order, Scarlett asserted that it had agreed "to indemnify, hold harmless, and otherwise assume all burdens, obligations, liabilities, and rights of the owners of the Property." (Doc. No. 161-10, p. 3.)  Based upon Scarlett's entry into the Consent Order and Scarlett's representations made therein, GEPD dismissed its

enforcement action against the Tuggles. Scarlett's indemnification of the Tuggles was formalized with a contractual agreement in August 2008.

With respect to the relevant involvement of Defendant Faison & Associates, LLC ("Faison") with the Shopping Center, on September 1, 1995, shortly after Scarlett and AmSouth entered into a Ground Lease for the Shopping Center, AmSouth and Faison entered into an agreement under which Faison agreed to perform certain property management services regarding the Shopping Center. Faison served in this capacity until approximately September 1, 1997, when its involvement with the Shopping Center ended. Contrary to Scarlett's allegation in the Complaint that Faison was a "primary subleasee" of the Property, Scarlett now admits that Faison has never been a party to any lease involving any portion of the Property. Scarlett admits that Faison did not maintain an office or personnel at the Shopping Center, had no access to keys to any leased space, and had no authority to evict tenants.

Scarlett and Faison otherwise dispute the scope of Faison's role and responsibilities. Faison asserts that it served only in a limited capacity, never managed any tenant operations, had no control over which tenants were permitted to lease space, and had no control over hazardous substance handling by any tenant, including the dry cleaner. Faison further states that, as is typical at a retail strip mall, Faison's principal responsibilities were to attempt to rent space to tenants that were approved by AmSouth, collect rent, maintain the common areas of the Shopping Center, pay bills in a timely manner, and send any excess revenues to AmSouth. Scarlett, on the other hand, emphasizes that the Management Agreement between AmSouth and Faison provides that Faison was hired "to supervise and to manage the operation of the [Shopping Center] and as the exclusive leasing agent thereof." (Doc. No. 163-2, p. 1.) Scarlett additionally points out that Faison had the following specific duties: (a) obtaining all necessary governmental approval and permits and performing such acts necessary to effect AmSouth's compliance with

all laws applicable to the operation of the Shopping Center; (b) negotiating and entering into contracts on behalf of AmSouth and on terms approved by AmSouth with, and supervising the performance of, all independent contractors, subcontractors, suppliers, and servicing agents, required for the proper management, leasing, maintenance, repair, and operation of the Shopping Center and the construction of tenant improvements; (c) maintaining financial and business books and records for AmSouth; (d) soliciting, negotiating, causing to be prepared, and executing tenant leases and renewals and extensions of tenant leases for space in the Shopping Center upon such terms and conditions as Faison deemed appropriate; (e) paying all independent contractors, architects, engineers, subcontractors, suppliers, and service agents utilized in management, operation, maintenance, or repair of the Shopping Center or construction of tenant improvements; (f) purchasing all necessary supplies and equipment for the proper operation, maintenance, repair and restoration of the Shopping Center and the construction of tenant improvements; (g) making or causing to be made all repairs, replacements, renovations, and capital improvements on the Shopping Center approved by AmSouth; (h) making arrangements for and paying all charges owed by AmSouth for all utilities used in the operation of the Shopping Center; (i) filing all real and personal ad valorem property tax returns required to be filed by AmSouth and paying all ad valorem taxes on and assessments against the Shopping Center that are required to be paid by AmSouth; (j) receiving and collecting rent from all tenants and bringing legal action against any tenants or occupants to collect any past due rent or charges or to enforce the terms of any tenant lease; (k) repairing or restoring the Shopping Center in the event of damage or destruction; (l) furnishing to the tenants of the Shopping Center all services as are usually or customarily furnished or rendered in connection with the rental of space in such a shopping center; and (m) taking all action deemed advisable for the efficient and economic management, leasing, operation, and maintenance of the Shopping Center.

Faison also was responsible for maintaining the books of account, preparing monthly financial and operating statements, and preparing the annual operating budget. According to the lease with Atlanta Enterprises, Faison was the contact for AmSouth. Faison also took responsibility for ensuring that the operators of the dry cleaning business complied with the Environmental Protection Agency's reporting requirements on dry cleaning facilities covering PCE emissions, equipment monitoring and repair, and accounting of PCE consumption.

In addition to the foregoing, Scarlett points out that AmSouth was named as a Potentially Responsible Party ("PRP") by GEPD on March 23, 1999, by virtue of its lease interest in the Shopping Center where the dry cleaning facility was located. In response, AmSouth argued that it was entitled to the Secured Creditor Exemption under the HSRA. In support of its arguments to GEPD, AmSouth represented to GEPD that: (a) AmSouth acquired the Note and Deed to Secure Debt of the Shopping Center after Briarcliff Station Associates, Ltd. defaulted under its construction loan for the Shopping Center; (b) AmSouth entered into a sublease of the Shopping Center with Scarlett in August 1995 after Briarcliff Station Associates, Ltd. defaulted under the terms of the lease; (c) AmSouth hired Faison to manage the Shopping Center until AmSouth's interest in the Shopping Center was sold in July 1997; (d) AmSouth was the sublessee of Scarlett and took on the indicia of ownership under the sublease for the sole purpose of protecting its security interest by exercising its right to receive rental income from the property; (e) AmSouth's involvement with the Shopping Center was entirely through Faison, which conducted only normal maintenance, management, and marketing activities; and (f) AmSouth's involvement with the dry cleaning business was through Faison and was limited to collection of money under the dry cleaner's rental agreement, repair of the dry cleaner's roof, and execution of a lease with the new owners of the business. Subsequently, AmSouth produced certain documents to demonstrate its lack of direct involvement with the Shopping Center, which included "Faison

Monthly Management Reports for Briarcliff Station Shopping Center" and the Management Agreement with Faison. GEPD entered an Administrative Order against AmSouth on December 6, 1999, requiring AmSouth to take certain actions to address the contamination at the Shopping Center. On February 15, 2000, GEPD extended the time for AmSouth to comply with the terms of the Administrative Order and also requested information necessary to determine the status of AmSouth under the Secured Creditor Exemption of HSRA. On August 10, 2001, GEPD found that AmSouth qualified for the Secured Creditor Exemption based on information provided by Hollene Darby of Faison.

## II.     STANDARD

Summary judgment is proper where the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is "material" if it might affect the outcome of the case under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted). However, the nonmoving party "may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." Anderson, 477 U.S. at 252.

**III.   FAISON'S AND SCARLETT'S MOTIONS FOR SUMMARY JUDGMENT AND SCARLETT'S MOTION FOR LEAVE TO AMEND COMPLAINT**

　　A.　　<u>CERCLA and HSRA Claims</u>

Scarlett's principal claims against Faison are for cost recovery under the Comprehensive Environmental Response, Compensation and Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9607(a), and CERCLA's state counterpart, the Georgia Hazardous Site Response Act ("HSRA"), O.C.G.A. § 12-8-90 <u>et</u> <u>seq.</u> Scarlett also asserts a CERCLA "contribution" claim under 42 U.S.C. § 9613(f) and (g). Faison moves the Court for summary judgment on all of these claims. Scarlett opposes Faison's motion and requests that the Court enter summary judgment in its favor.

　　　　1.　　*Contribution Claim*

With respect to the "contribution" claim, Scarlett does not dispute that this claim must be dismissed due to Scarlett's lack of standing to maintain it. <u>See</u> <u>Cooper Indus., Inc. v. Aviall Servs., Inc.</u>, 543 U.S. 157, 166-68, 125 S. Ct. 577, 160 L. Ed. 2d 548 (2004) (holding that a plaintiff may not maintain a CERCLA contribution claim unless there is an ongoing or completed government CERCLA action against the plaintiff). Accordingly, without the need for further discussion or analysis, the Court deems the "contribution" claim abandoned and grants Faison summary judgment on this claim. <u>See</u> <u>Resolution Trust Corp. v. Dunmar Corp.</u>, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (citations omitted); <u>Burnett v. Northside Hosp.</u>, 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004) (plaintiff's failure to address a challenged claim on summary judgment warranted dismissal of that claim); <u>Bute v. Schuller Int'l, Inc.</u>, 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) ("Because plaintiff has failed to respond to this argument or otherwise address this claim, the Court deems it abandoned."); <u>Welch v. Delta Air Lines</u>, 978 F. Supp. 1133, 1137 (N.D. Ga. 1997) ("Plaintiff's failure to respond to [d]efendant's argument alone entitles

[d]efendant to summary judgment on these claims.").

> 2. *Cost Recovery Claims*

CERCLA and HSRA incorporate the same definitions and liability standards. Canadyne-Georgia Corp. v. NationsBank, N.A. (South), 183 F.3d 1269, 1272 n. 3 (11th Cir. 1999). An essential element of the claims under CERCLA and HSRA requires Scarlett to prove that Faison is a "covered person." Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d 1489, 1496-97 (11th Cir. 1996). Scarlett also must prove that the property at issue is a "facility," that a release of hazardous substances has occurred, and that Scarlett has incurred response costs consistent with the National Contingency Plan. Id. at 1496. These latter elements of the CERCLA and HSRA claims are not at issue for purposes of the summary judgment motions pending before the Court. Rather, the only dispute is whether Faison is a "covered person."

Title 42 U.S.C. § 9607(a) sets forth the following categories of "covered persons":

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance[.]

42 U.S.C. § 9607(a). In the instant action, Scarlett asserts that Faison is liable as both an owner of the Shopping Center and an operator of the dry cleaning facility at the time of disposal of hazardous substances at the Shopping Center.

### a. Owner Liability

Scarlett argues that Faison is liable as an owner of the Shopping Center, although Scarlett did not specifically allege such in its Complaint. Plaintiff has moved the Court for leave to amend its Complaint to emphasize its theory of owner liability, and the parties have briefed the issue of owner liability on summary judgment. Based on the evidence presented by the parties, Scarlett's theory of owner liability is without merit.

Under both CERCLA and HSRA, the definition of "owner" of contaminated property is any person "owning" such property. 42 U.S.C. § 9601(20)(A)(ii); O.C.G.A. § 12-8-92(7). The term "owner" is to be given its "ordinary meaning[]." Monarch Tile, Inc. v. City of Florence, 212 F.3d 1219, 1221-22 (11th Cir. 2000) (citation omitted). "The question of whether a particular defendant can be deemed an 'owner' under CERCLA [and HSRA] turns on application of state law...." Canadyne-Georgia Corp., 183 F.3d at 1273 (citation omitted). Thus, if Faison is not an "owner" of the Shopping Center under Georgia law, it is not an "owner" under CERCLA or HSRA. See Redwing Carriers, 94 F.3d at 1497-1505.

Based on the ordinary meaning of "owner," the Court concludes that Faison is not an "owner" or former "owner" of the Shopping Center. There is no dispute that fee simple ownership of the Shopping Center has been held at all relevant times by the Tuggles. In 1965, the Tuggles leased the Shopping Center to C & A. Scarlett inherited C & A's property rights under the lease in 1995. The Shopping Center was sublet to Defendant Retail Centers, Ltd., and the sublease was assigned to Defendant Briarcliff Station Associates, Ltd. Briarcliff Station Associates, Ltd. in turn sub-sub-leased a portion of the Shopping Center to a series of sub-sub-tenants that operated a dry cleaning business that contributed to the contamination. In August 1995, after Briarcliff Station Associates, Ltd. defaulted on the loan given by AmSouth, Scarlett sub-leased the shopping center to AmSouth. The sub-sub-tenants continued operating the dry cleaner business. In September 1995, AmSouth hired Faison as the

property manager. On September 1, 1997, AmSouth assigned its sublease to Defendant Briarcliff Center Partners, LLC, at which time Faison's involvement with the Shopping Center ceased. Based on these undisputed facts, Faison never "owned" the Shopping Center under the "ordinary meaning" of "owner." Monarch Tile, 212 F.3d at 1221-22.

Scarlett argues that Faison, as the company hired by AmSouth to supervise and manage the operation of the Shopping Center, stood in the shoes of AmSouth and thus is liable as an owner. In support of this argument, Scarlett relies on several federal cases from outside the Eleventh Circuit holding that a lessee may, under some circumstances, be considered a CERCLA "owner." See Burlington Northern R.R. Co. v. Woods Indus., Inc., 815 F. Supp. 1384, 1391 (E.D. Wash. 1993) (holding that lessee is considered "owner" for purposes of § 9607(a)(1) because lessee asserted control over the use of the property); United States v. A & N Cleaners and Launderers, Inc., 788 F. Supp. 1317, 1331-34 (S.D.N.Y. 1992) ("The undisputed facts establish that [lessee] exercised a degree of site control over the Property, that, under this definition, confers ownership status upon it for purposes of CERCLA § 107(a)."); United States v. South Carolina Recycling and Disposal, Inc., 653 F. Supp. 984, 1003 (D.S.C. 1984) (holding liable as owner under CERCLA a lessee/sublessor who "maintained control over and responsibility for the use of the property and, essentially, stood in the shoes of the property owner"), aff'd in part, vac'd in part, United States v. Monsanto Co., 858 F.2d 160 (4th Cir. 1988). Even if the Court found these cases persuasive, Faison's activities at the Shopping Center do not subject it to owner liability even under the standard set forth in these cases.

The cases relied on by Scarlett in support of its owner liability theory inform that a court should look at the degree of site control that a lessee asserted or exercised to determine the lessee's liability as an owner. Woods Indus., Inc., 815 F. Supp. at 1391; A & N Cleaners and Launderers, Inc., 788 F. Supp. at 1332; South Carolina Recycling & Disposal, Inc., 653 F. Supp. at 1003. Here, Faison, which was

not even a lessee, did not have or exercise sufficient control over the Shopping Center to be liable as an owner. Most importantly, although Faison had the authority to solicit, to negotiate, to cause to be prepared, and to execute tenant leases, the Management Agreement between AmSouth and Faison precluded Faison from entering into or renewing any tenant lease or committing AmSouth to a tenant lease without the prior written authorization of AmSouth. (Management Agreement [Doc. No. 163-2] §§ 3.1(d), 4.2) Hence, unlike the facts presented in the cases relied on by Scarlett where owner liability was found, Faison did not have ultimate control over the use of the premises. Rather, AmSouth made the final determination regarding what businesses would be permitted to lease space at the Shopping Center and was, in fact, the party that signed the tenant leases. (See Shopping Center Lease Between AmSouth Bank of Florida and Atlanta Enterprises, Inc. [Doc. No. 163-14].) There is no evidence that Faison was ever a party to any lease with the dry cleaning business or any other tenant at the Shopping Center. Similarly, while Faison had authority to negotiate with and enter into contracts with independent contractors, subcontractors, suppliers, and servicing agents on behalf of AmSouth, the terms of the contracts had to be approved by AmSouth. (Management Agreement § 3.1(b)(2).) Further, while Faison was responsible for making or causing to be made all repairs, replacements, renovations, and capital improvements, the Management Agreement required Faison to obtain AmSouth's prior written authorization to expend any sums or to incur any obligation for the expenditure of sums with respect to any item of expense that was not included in the annual budget or with respect to any instance of maintenance, repair, or alteration of the Shopping Center in an amount exceeding $2,500.00. (Management Agreement §§ 3.1(h), 4.3.) Moreover, the annual budget itself was subject to AmSouth's written approval. (Management Agreement § 5.4(a).) Thus, AmSouth retained significant control over the repairs, replacements, renovations, and capital improvements at the Shopping Center. Faison also had responsibility under the Management Agreement to obtain

and keep in effect adequate and sufficient policies of insurance for the Shopping Center, but these policies had to be of the types and in the amounts acceptable to AmSouth. (Management Agreement § 3.1(k).) In sum, Faison had many duties related to the operation of the Shopping Center, but AmSouth remained in ultimate control of the Shopping Center and the manner in which it would be used. In these circumstances, and notwithstanding any representations that AmSouth made to GEPD that may have led GEPD not to deem AmSouth a responsible party for the environmental contamination, the Court does not find that Faison exercised the requisite degree of control over the Shopping Center to be deemed an owner of the Shopping Center. Since Scarlett's owner theory of liability is without legal merit, an amendment to the Complaint to emphasize owner liability would be futile and will not be permitted. See Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962) (holding that futility is a valid reason for denying motion to amend); Brewer-Girogio v. Producers Video, Inc., 216 F.3d 1281, 1285 (11th Cir. 2000) (same).

### b. Operator Liability

Scarlett next contends that Faison is a former "operator" of the dry cleaning business and that Faison therefore is a "covered person." CERCLA generally defines an operator as "any person ... operating [a covered] facility." 42 U.S.C. § 9601(20)(A)(ii). The Supreme Court refined the rather circuitous definition of "operator" in United States v. Bestfoods, 524 U.S. 51, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998). According to Bestfoods, "under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of the facility." Id. at 66. "[A]n operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." Id. at 66-67. Following Bestfoods, the Eleventh Circuit has held that "operator" status requires that a party be "actually involved in operations involving leakage or disposal of hazardous waste." Atlanta Gas Light Co. v. UGI Utils., Inc., 463 F.3d 1201, 1206

(11th Cir. 2006).

Scarlett contends that the <u>Bestfoods</u> analysis and its definition of "operator" are limited to the parent-subsidiary or corporate liability context, but this Court disagrees. Although the Supreme Court addressed in <u>Bestfoods</u> "whether a parent corporation that actively participated in, and exercised control over, the operations of a subsidiary may, without more, be held liable as an operator of a polluting facility owned or operated by the subsidiary," <u>id.</u> at 55, the Supreme Court supplied the definition of "operator" in the context of evaluating the parent corporation's direct liability for the environmental contamination at issue in the case, <u>id.</u> at 66. Since <u>Bestfoods</u>, numerous courts properly have utilized this definition to determine issues of liability under CERCLA outside of the parent-subsidiary context. <u>See, e.g.</u>, <u>United States v. Township of Brighton</u>, 153 F.3d 307, 313-16 (6th Cir. 1998); <u>City of Waukegan, Illinois v. National Gypsum Co.</u>, 560 F. Supp. 2d 636, 642-46 (N.D. Ill. 2008); <u>City of Wichita, Kansas v. Trustees of the APCO Oil Corp. Liquidating Trust</u>, 306 F. Supp. 2d 1040, 1054 (D. Kan. 2003). Insofar as this Court does not read <u>Bestfoods</u> to limits its definition of "operator" to the parent-subsidiary context, the Court holds that the definition of "operator" supplied in <u>Bestfoods</u> is controlling and will apply that definition in this case.[3]

The evidence of record discloses a genuine dispute between the parties as to whether Faison acted as "operator" of the dry cleaning business within the meaning supplied by the Supreme Court in <u>Bestfoods</u> for the term "operator." In support of its argument that it was not an "operator," Faison relies on the deposition testimony of Patricia Chatham, the president and sole owner of Scarlett, who testified that she

---

[3]     The Court agrees with Faison that the "operator" test set forth in <u>Bestfoods</u> supplants the "operator" test that the Eleventh Circuit previously set forth in <u>Redwing Carriers</u>, as the <u>Redwing Carriers</u> test, unlike the <u>Bestfoods</u> test, did not require that the alleged operator have engaged in activities specifically related to pollution. <u>See</u> <u>Redwing Carriers</u>, 94 F.3d at 1504-05.

had no knowledge of any evidence that Faison managed, directed or conducted any operations at the dry cleaning business, that Faison was involved in handling hazardous materials, or that Faison stored, collected, transported, or disposed of any hazardous materials. Faison also relies on the Declaration of P. Robert Jackson, the Vice President of AmSouth during the relevant time period, who attested that Faison did not manage or control tenant operations at the Shopping Center and had no authority to evict tenants. Significantly, however, Scarlett presents evidence that Faison played at least a minimal role in managing the dry cleaner's operations specifically related to pollution. In this regard, Hollene M. Darby, on behalf of Faison, sent the dry cleaner a certified letter advising the dry cleaner of reporting requirements of the Environmental Protection Agency ("EPA"). In order to document Faison's files and insure governmental compliance, Ms. Darby requested copies of the documentation that the dry cleaner was required to provide to the EPA or an explanation as to why the dry cleaner was exempt from providing such documentation. This correspondence sent by Faison, combined with the other evidence of record indicating that Faison generally was responsible for managing and maintaining the Shopping Center and performing all acts necessary to effect AmSouth's compliance with all laws, rules, ordinances, statutes, and regulations of any governmental authority applicable to the operation of the Shopping Center, is sufficient to create a genuine issue as to whether Faison managed the operations of the dry cleaner specifically related to pollution and whether Faison therefore meets the definition of a former "operator." Based on the presence of this genuine dispute, the Court denies both parties' respective requests for summary judgment.

B.      RCRA Claims

Scarlett also asserts claims against Faison under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 et seq. RCRA "is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." Meghrig v. KFC Western, Inc., 516 U.S. 479, 483, 116 S. Ct. 1251,

134 L. Ed. 2d 121 (1996). RCRA allows a private plaintiff to sue two types of defendants: (1) a party "in violation of any [RCRA] permit, standard, regulation, condition, requirement, prohibition or order" and/or (2) a "past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(A)-(B). Scarlett asserts both types of RCRA claims in this litigation.

### 1.    *Statute of Limitations*

Faison maintains that the RCRA claims are time-barred. The Court disagrees. Federal environmental statutes that do not contain their own statute of limitations, such as the RCRA, are subject to the general five-year statute of limitations set forth in 28 U.S.C. § 2462. E.g., National Parks and Conservation Ass'n, Inc. v. Tennessee Valley Auth., 502 F.3d 1316, 1322 (11th Cir. 2007) (applying 28 U.S.C. § 2462 to bar claim under Clean Water Act). The five-year limitation period established by 28 U.S.C. § 2462 begins to run on "the date that a violation first occurs." Id. If the violation continues within the limitations period, however, the statute of limitations is tolled for a claim that otherwise would be time-barred. Id. ("Under the continuing violations doctrine, the statute of limitations is tolled for a claim that otherwise would be time-barred where the violation giving rise to the claim continues to occur within the limitations period.").

As Scarlett argues, a number of federal district courts have held that the continued presence of illegally dumped hazardous wastes may constitute a "current violation" of a RCRA regulation or standard, despite the fact that the operator's conduct occurred in the past. See Marrero Hernandez v. Esso Standard Oil Co., 597 F. Supp. 2d 272, 283 (D.P.R. 2009) (holding that unremedied, migrating contamination is not a wholly past violation); Cameron v. Peach County, GA, No. 5:02-CV-41-1 (CAR), 2004 WL 5520003, at *26-27 (M.D. Ga. June 28, 2004) (holding

that the continued presence of illegal contamination that remains remedial constitutes a continuing violation, even though the acts of unlawful disposal occurred in the past); <u>California v. M & P Invs.</u>, 308 F. Supp. 2d 1137, 1146-47 (E.D. Cal. 2003) (holding that a continuous violation under RCRA is present where improperly discharged hazardous wastes "continue to exist unremediated" at the contamination site); <u>Aurora Nat'l Bank v. Tri Star Marketing, Inc.</u>, 990 F. Supp. 1020, 1025 (N.D. Ill. 1998) ("Although subsection (a)(1)(A) does not permit a citizen suit for wholly past violations of the statute, the continued presence of illegally dumped materials generally constitutes a 'continuing violation' of the RCRA, which is cognizable under § 6972(a)(1)(A).") (internal citation omitted); <u>City of Toledo v. Beazer Materials & Servs., Inc.</u>, 833 F. Supp. 646, 656 (N.D. Ohio 1993) (holding a valid claim exists against a prior owner under § 6972(a)(1)(A) "as long as no proper disposal procedures are put into effect or as long as the waste has not been cleaned up and the environmental effects remain remediable."); <u>Gache v. Town of Harrison</u>, 813 F. Supp. 1037, 1041-42 (S.D.N.Y. 1993) ("[I]mproperly discharged wastes which continue to exist unremediated represent a continuing violation of RCRA."); <u>Acme Printing Ink Co. v. Menard, Inc.</u>, 812 F. Supp. 1498, 1512 (E.D. Wisc. 1992) ("RCRA includes in its broad definition of 'disposal' the continuous leaking of hazardous substances.... Accordingly, leaking of hazardous substances may constitute a continuous or intermittent violation of RCRA."); <u>Fallowfield Dev. Corp. v. Strunk</u>, No. 89-8644, 1990 WL 52745, at *10 (E.D. Pa. Apr. 23, 1990) ("If a person disposes of hazardous waste on a parcel of property, the hazardous waste remains in that property insidiously infecting the soil and groundwater aquifers. In other words, the violation *continues* until the proper disposal procedures are put into effect *or* the hazardous waste is cleaned up."). <u>But see</u> <u>Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.</u>, 989 F.2d 1305, 1315 (2d Cir.1993) (holding that lead shot and clay target debris previously deposited into Long Island Sound by trap and skeet shoot club, although decomposing and contaminating wildlife, did not

constitute "present violation" of RCRA for purposes of citizen's suit under 42 U.S.C. § 6972(a)); Board of County Com'rs of County of La Plata, Colorado v. Brown Group Retail, Inc., 598 F. Supp. 2d 1185, 1201-02 (D. Colo. 2009) (holding that a polluter who no longer owns or operates a pollution site is not subject to suit under § 6972(a)(1)(A)); Coburn v. Sun Chem. Corp., No. 88-0120, 1988 WL 120739, at *9 (E.D. Pa. Nov. 9, 1988) (ongoing violation was not established with respect to a past operator of a facility that lacked permits for storage of hazardous waste). As the Middle District of Georgia recognized in Cameron, the Eleventh Circuit has not addressed the issue of whether the continued presence of migrating waste constitutes a continuing violation under the RCRA. 2004 WL 5520003, at *27. In the absence of such Eleventh Circuit authority, and because the Court agrees with the analysis of the courts in the cases cited above, this Court, like the Cameron court, will follow the majority rule.

In the case at bar, specifically, Scarlett has presented evidence from environmental investigations indicating the continuous expansion and migration of the PCE plume since it was discovered in the early to mid 1990s. These investigations also indicated active ongoing releases of hazardous substances from the operation of the dry cleaning facility during the time period that Faison managed the Shopping Center on behalf of AmSouth. There is no dispute that the PCE contamination has not yet been cleaned up and the environmental damage has not been sufficiently remedied. As such, the Court holds that the contamination of the property from PCE remains an ongoing RCRA violation. The RCRA claims are not time-barred.

### 2. The RCRA § 6972(a)(1)(A) Claim

An actionable claim under RCRA § 6972(a)(1)(A) requires that, at the time litigation is commenced, the defendant be engaged in a "continuous or ongoing violation" of a RCRA permit or other requirement. Parker v. Scrap Metal Processors, Inc., 386 F.3d 993, 1011 n. 20 (11th Cir. 2004). Scarlett alleges in this action that when

suit was filed in January 2005, all defendants were in violation of RCRA's open dumping prohibition and RCRA regulations governing the operation of a hazardous waste treatment, storage, and disposal facility. Scarlett further alleges that the violations stem from the continued discharge and presence of materials allegedly disposed of prior to this lawsuit.

### a. Open Dumping

Under the RCRA, "any solid waste management practice or disposal of solid waste which constitute the open dumping of solid waste or hazardous waste is prohibited...." 42 U.S.C. § 6945(a). This prohibition is enforceable "against persons engaged in the act of open dumping." Id.; see also Cox v. City of Dallas, Texas, No. 3:98-CV-0291-H, 1999 WL 33756552, at *12 (N.D. Tex. Aug. 4, 1999) ("Section 6945(a), by its terms, only authorizes suits against those persons 'engaged in the act of open dumping.'"). In the case at bar, the record is devoid of evidence that Faison itself ever "engaged in the act of open dumping." Accordingly, Faison is entitled to summary judgment on the open dumping claim. See Cox, 1999 WL 33756552, at *12 (holding that City of Dallas was not liable for violating prohibition against open dumping because there was no evidence that the City of Dallas had engaged in the act of open dumping itself).

### b. Operation of Hazardous Waste Facility

Scarlett's Section 6972(a)(1)(A) claim is likewise based on the allegation that when this action was commenced, Faison was "operating" a hazardous waste treatment, storage and disposal facility in violation of RCRA regulations. As with the CERCLA and HSRA claims, Faison asserts that it is not liable as an operator under the RCRA. Both parties agree and case law indicates that the definition of operator is the same under RCRA and CERCLA. LeClercq v. Lockformer Co., No. 00 C 7164, 2002 WL 908037, at *2 (N.D. Ill. May 6, 2002) ("[T]he statutory definition of 'owner' and 'operator' are the same under RCRA and CERCLA, and the standards for owner and operator liability under the two statutes are identical.")

(citing <u>Taglewood East Homeowners v. Charles-Thomas, Inc.</u>, 849 F.2d 1568, 1574 (5th Cir. 1988)). Accordingly, the Court's prior analysis regarding whether Faison is liable as an operator applies equally to the RCRA claims. For the reasons set forth <u>supra</u>, the Court finds that there is a genuine dispute of fact as to Faison's liability as an operator.

Further, even though Faison's involvement with the Shopping Center ended on or about September 1, 1997, as discussed previously above, many courts have concluded that the failure of a past owner or operator to remedy past contamination and to comply with regulations in connection with past contamination can constitute a continuous violation under § 6972(a)(1)(A), particularly when the contamination is shown to be migrating. <u>See</u> <u>Marrero Hernandez</u>, 597 F. Supp. 2d at 283; <u>Cameron</u>, 2004 WL 5520003, at *26-27; <u>M & P Investments</u>, 308 F. Supp. 2d at 1146-48; <u>Aurora Nat'l Bank, Inc.</u>, 990 F. Supp. at 1025; <u>Gache</u>, 819 F. Supp. at 1041; <u>Beazer Materials & Servs., Inc.</u>, 833 F. Supp. at 656; <u>Acme Printing Ink Co.</u>, 812 F. Supp. at 1512; <u>Fallowfield Dev. Corp.</u>, 1990 WL 52745, at *10 (E.D. Pa. Apr. 23, 1990). As stated <u>supra</u>, Scarlett, has presented evidence in this case from environmental investigations indicating the continuous expansion and migration of the PCE plume since it was discovered in the early to mid 1990s. These investigations also indicated active ongoing releases of hazardous substances from the operation of the dry cleaning facility during the time period that Faison managed the Shopping Center on behalf of AmSouth. There is no dispute that the PCE contamination has not yet been cleaned up and the environmental damage has not been sufficiently remedied.

In sum, then, the genuine dispute of fact as to whether Faison is liable as an operator precludes entry of summary judgment in favor of either Scarlett or Faison on this claim under § 6972(a)(1)(A), notwithstanding the fact that Faison ceased its involvement at the Shopping Center on or about September 1, 1997.

> 3. *The RCRA § 6972(a)(1)(B) Claim*

Scarlett also sues under RCRA § 6972(a)(1)(B), which allows a citizen suit

against a "past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). For this claim to survive Faison's request for summary judgment, there must be evidence that Faison was an "operator" of the dry cleaning business and that Faison's conduct "contributed to" handling, storage, treatment, transportation, or disposal of PCE. Id.

Faison first argues, as it has previously, that it never "operated" the dry cleaning business. For the reasons discussed supra, the Court finds a genuine dispute regarding whether Faison was an "operator" of the dry cleaning business.

However, based on the great weight of authority interpreting this statutory provision, the Court agrees with Faison that there is no evidence that Faison has contributed to or is contributing to the past or present handling, storage, treatment, transportation, or disposal of PCE. The Eleventh Circuit has not yet had an occasion to address the precise circumstances in which an owner or operator meets the requirement of having contributed to or contributing to the handling, storage, treatment, transportation, or disposal of any solid or hazardous waste. However, the Seventh Circuit recently addressed this exact issue in Sycamore Industrial Park Associates v. Ericsson, Inc., 546 F.3d 847 (7th Cir. 2008) and held as follows:

> A plain reading of the "has contributed or is contributing" language of § 6972(a)(1)(B) compels us to find that RCRA requires active involvement in handling or storage of materials for liability. The ordinary meaning of "contribute" is "to act as a determining factor." Webster's II New College Dictionary (2005). By definition, the phrase "has contributed or is contributing" requires affirmative action. The vast majority of courts that have considered this issue read RCRA to require affirmative action rather than merely passive conduct....

Id. at 854 (citations omitted). In ABB Industrial Systems, Inc. v. Prime Technology, Inc., 120 F.3d 351 (2d Cir. 1997), the Second Circuit likewise indicated that affirmative action is necessary to meet the "has contributed or is contributing"

requirement, as it affirmed the entry of summary judgment in favor of two defendants who the plaintiff could not show spilled hazardous chemicals or otherwise contaminated the site. Id. at 359. Several other federal courts that have considered the issue have ruled in line with the Second and Seventh Circuits and required more than passive conduct. See, e.g., Interfaith Cmty. Org. v. Honeywell Int'l, 263 F. Supp. 2d 796, 844-46 (D.N.J. 2003); Delaney v. Town of Carmel, 55 F. Supp. 2d 237, 255-57 (S.D.N.Y. 1999); Marriott Corp. v. Simkins Indus., Inc., 929 F. Supp. 396, 398 n. 2 (S.D. Fla. 1996). But see Cox v. City of Dallas, Texas, 256 F.3d 281, 296 (5th Cir. 2001) (holding that City's lax oversight of its contractors and their disposal of City waste was evidence of the City's "contributing to" liability). Several district courts specifically have required that a plaintiff establish a causal link between the contamination and the activities of the defendant. See Aurora Nat'l Bank, 990 F. Supp. at 1030; California DTSC v. Interstate Non-Ferrous Corp., 298 F. Supp. 2d 930, 979 (E.D. Cal. 2003) (holding that a plaintiff seeking to establish a § 6972(a)(1)(B) violation "must show a causal connection between [defendant's] actions and the current on-site contamination..."); In re Voluntary Purchasing Groups, Inc., Nos. 3:94-CV-2477-H, 3:96-CV-1927-H, 3:96-CV-1929-H, 3:96-CV-2985-H, 3:96-CV-2993-H, 3:96-CV-3057-H, 3:96-CV-2092-H, 3:96-CV-3093-H, 3:96-CV-3094-H, 2002 WL 31431652, at * (N.D. Tex. Oct. 22, 2002) ("[T]he Court holds that the Plaintiffs must establish some level of causation between the Defendant and the contamination to prevail in a 'contributing to' cause of action under RCRA.").

While the Court has previously found evidence supporting the inference that Faison played a minimal role  in managing the dry cleaner's operations specifically related to pollution such that Faison's liability as an operator cannot be determined on summary judgment, the evidence relied on by Scarlett far from shows that Faison acted as a determining factor over either the handling, storage, treatment, transportation, or disposal of PCE.  The uncontroverted evidence establishes that Faison never handled, stored, treated, transported, or disposed of any PCE.  Rather,

Faison only inquired with the dry cleaning business regarding its compliance with reporting requirements. Scarlett has failed in its summary judgment papers to point to significantly probative evidence causally linking any of Faison's acts to the pollution in this case. Therefore, Faison is entitled to summary judgment on the § 6972(a)(1)(B) claim.

### C. State Law Claims

Scarlett also seeks redress for contamination of the Shopping Center site based on trespass and other common law theories, including breach of contract, nuisance, negligence, and negligence per se. Scarlett further seeks damage under state law for indemnity and/or contribution.

#### 1. Statute of Limitations

Georgia's four-year statute of limitations governs common law claims involving damage to real property. Parker v. Scrap Metal Processors, Inc., 386 F.3d 993, 1016 (11th Cir. 2004) (citing O.C.G.A. § 9-3-30). This statute of limitations applies to all common law property damage claims, except breach of written contract, for which the statute of limitations is six years. Gropper v. STO Corp., 250 Ga. App. 820, 822-23, 552 S.E.2d 118 (2001). Because the alleged property damage at issue in this case involves environmental contamination, Georgia's four-year limitations period is subject to the accrual rule, or the Federal Discovery Rule, set forth in 42 U.S.C. § 9658(a)(1). Briggs & Stratton Corp. v. Concrete Sales & Servs., 29 F. Supp. 2d 1372, 1376-81 (M.D. Ga. 1998). Thereunder, the four-year period on the common law claims began to run when Scarlett "knew (or reasonably could have known) that the personal injury or property damages ... were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4). If, however, the commencement date is later under state law than it is under federal law, the state law standard applies. O'Connor v. Boeing North American, Inc., 311 F.3d 1139, 1146-47 (9th Cir. 2002).

The Georgia Supreme Court has long recognized continuing tort liability for

property damage in nuisance and trespass cases. See, e.g., City of Columbus v. Myszka, 246 Ga. 571, 272 S.E.2d 302 (1980); Shaheen v. G&G Corp., 230 Ga. 646, 198 S.E.2d 853 (1973). Based on this state law precedent, the Eleventh Circuit stated as follows in Tucker v. Southern Wood Piedmont Company, 28 F.3d 1089 (11th Cir. 1994):

> Under Georgia law, a cause of action for a tort that is continuing in nature - for example, the frequent runoff of contaminated water across land, or (as in the present case) the underground leakage of hazardous waste onto adjoining property - accrues at the time of continuance.

Id. at 1091 (citing Myska, 246 Ga. at 571). Similarly, in Hoffman v. Atlanta Gas Light, 206 Ga. App. 727, 426 S.E.2d 387 (1992), the Georgia Court of Appeals addressed whether the migration or spreading of contamination constitutes a continuing nuisance and found as follows:

> [S]uit may be maintained for damages growing out of a nuisance of the character indicated, where the damages ... were inflicted within four years before the time of filing suit, though the act which originally caused the nuisance was not done within the period of limitation of the action.... The nuisance in this case is the continuing contamination, not the old leaks. The damage was not complete upon the completion of the creation of the leaks, so appellants are not limited to a cause of action filed within the period of limitations following creation of the leaks or the repairing of the leaks. The damages growing out of the nuisance are the continuing hurt, inconvenience, or damage caused by the hyrdocarbon contamination, for which O.C.G.A. § 41-1-1 gives a cause of action, and which were not assuaged by Plantation's sale of the pipeline to another.

206 Ga. App. at 730 (internal citations and marks omitted). The Hoffman court went on to hold that a defendant was "not insulated from responsibility for the maintenance of a continuing nuisance merely by the fact that it did not create the contamination and had no 'causal' relation to the contamination as it was first created," because the maintenance of a nuisance is continuance of the nuisance. Id. at 731.

Under the continuing tort doctrine in Georgia, Scarlett's claims accrue with each new instance of the migration of the contamination. Accordingly, the state statute of limitations is not earlier than the federal commencement date, and the

Federal Discovery Rule does not apply to Scarlett's state law tort claims. <u>See</u> <u>O'Connor</u>, 311 F.3d 1146-47. Thus, Scarlett's claims for nuisance and trespass are not barred by the statute of limitations, as Scarlett has presented evidence of a continuing tort.

Scarlett's claims for breach of contract, negligence, and negligence <u>per</u> <u>se</u> are time barred. With respect to these claims, the statute of limitations began to run when Scarlett notified the GEPD of the PCE in 1994, pursuant to the accrual rule in 42 U.S.C. § 9658(a)(1). Consequently, the four-year statute of limitations for Scarlett's negligence and negligence per se claims ran in 1998. Further, the six-year statute of limitations for Scarlett's breach of contract claim ran, at the latest, in 2003, six years after the contract between Faison and Scarlett expired. Therefore, when Scarlett filed this action on January 19, 2005, the statute of limitations on its common law claims for negligence, negligence per se, and breach of contract had expired, and Faison is entitled to summary judgment on these counts.

2. *Nuisance and Trespass Claims*

Faison argues that it is entitled to summary judgment on Scarlett's nuisance and trespass claims because Scarlett cannot establish or even point to a genuine issue of material fact as to whether Faison is liable for nuisance or trespass. The essential element of nuisance is control over the cause of the harm. <u>See, e.g.</u>, <u>Fielder v. Rice Constr. Co.</u>, 239 Ga. App. 362, 366, 522 S.E.2d 13 (1999). "The tortfeasor must be either the cause or a concurrent cause of the creation, continuance, or maintenance of the nuisance." <u>Id.</u> (citations omitted). "While ownership of property generally may give rise to a nuisance when property is used to cause harm to others, such ownership is not an essential element of the cause of action for nuisance." <u>Id.</u> at 365. "Rather, the exercise of dominion or control over the property causing the harm is sufficient to establish nuisance liability." <u>City of Columbus v. Barngrover</u>, 250 Ga. App. 589, 592, 552 S.E.2d 536 (2001). A property owner may maintain an action sounding in both nuisance and trespass for the contamination of his property by a

foreign substance.  <u>Hoffman</u>, 206 Ga. App. at 727; <u>Ledbetter Bros., Inc. v. Holcomb</u>, 108 Ga. App. 282, 132 S.E.2d 805 (1963).

In the instant case, questions of fact remain regarding Faison's oversight and management of the operations of the dry cleaning business specifically related to pollution.  Further, questions of fact remain regarding Faison's liability for maintaining the nuisance.  Based on the evidence of record, a reasonable jury might find Faison liable for nuisance and/or trespass.  Accordingly, these claims are not appropriate for resolution at the summary judgment stage.

3.  *Scarlett's Standing to Maintain the Nuisance and Trespass Claims*

Faison finally asserts that Scarlett lacks standing to maintain the nuisance and trespass claims because Scarlett does not own or occupy the Property.  The Court disagrees. Georgia law requires that actionable nuisance and trespass claims require that the plaintiff own or occupy the subject property.  <u>E.g.</u>, <u>Parker</u>, 386 F.3d at 1017 (quoting <u>Briggs</u>, 29 F. Supp. 2d at 1377).  In this case, the Court finds that, under state law, Scarlett is the <u>de facto</u> owner of the Property by virtue of its interest in the property through an estate for years.

Scarlett holds an estate for years in the Property by virtue of its long-term master leasehold interest in the Property. O.C.G.A. §§ 44-6-100, 44-6-101, 44-6-102; <u>e.g.</u>, <u>Jekyll Dev. Assocs., L.P. v. Glynn County Bd. of Tax Assessors</u>, 240 Ga. App. 273 (1999).  An estate for years carries with it the right to use property in as absolute manner as may be done with a greater estate.  O.C.G.A. § 44-6-103; <u>Jekyll Dev. Assocs.</u>, 240 Ga. App. at 274.  An estate for years passes as realty and may be bought and sold as any other estate, subject to the terms and conditions of the lease. O.C.G.A. §§ 44-6-100, 44-6-102, 44-7-1; <u>e.g.</u>, <u>Paces Partnership v. Grant</u>, 212 Ga. App. 621 (1994).  "[I]t is the policy of the law to treat the tenant of any estate for years as the owner, during the life of such estate."  <u>Evans Theatre Corp. v. De Give Inv. Co.</u>, 79 Ga. App. 62, 66, 52 S.E.2d 655 (1949).  Accordingly, under its lease with the Tuggles and pursuant to Georgia law, Scarlett is the <u>de facto</u> owner of the Property.

As such, assuming Scarlett is successful at establishing liability, Scarlett is entitled to damages on its claims for nuisance and trespass as the <u>de facto</u> owner.

## IV.  TUGGLES' MOTION FOR SUMMARY JUDGMENT

Third Party-Defendants Roy S. Tuggle and Virginia E. Tuggle move for summary judgment on the contribution claims that Faison has asserted against them under various statutes.  For the reasons that follow, the Court concludes that the Tuggles' Motion for Summary Judgment is due to be granted in part and denied in part.

### A.  Contribution Claims Under 42 U.S.C. § 9607 and O.C.G.A. § 12-8-96

The Tuggles first move for summary judgment on the contribution claims asserted under 42 U.S.C. § 9607 ("CERCLA § 107") and § 12-8-96 of HSRA.  Faison clarifies in its response, however, that it does not assert a contribution claim under CERCLA § 107 and that it likely is no longer in a position to maintain a contribution claim against the Tuggles under O.C.G.A. § 12-8-96.  To the extent that Faison's pleadings could be construed to assert a contribution claim under CERCLA § 107 and because Faison does not appear to oppose the entry of summary judgment on the contribution claim under O.C.G.A. § 12-8-96, the Court grants the Tuggles summary judgment on these claims.

### B.  Contribution Claims Under 42 U.S.C. § 9613(f) and O.C.G.A. § 23-2-71

The Tuggles next contend that they are entitled to summary judgment on Faison's contribution claims under 42 U.S.C. § 9613(f) ("CERCLA § 113(f)") and O.C.G.A. § 23-2-71 because the undisputed facts demonstrate that the Tuggles' proportionate share of liability can only be zero.  Faison opposes the entry of summary judgment on these particular contribution claims.

Section 107(a) of CERCLA imposes liability upon four types of PRPs, including "the owner ... of a vessel or a facility."  <u>United States v. Atlantic Research</u>, 551 U.S. 128, 135 n. 2, 238 S. Ct. 2331, 168 L. Ed. 2d 28 (2007).  Under CERCLA § 113(f), "[a]ny person may seek contribution from any other person who is liable or

potentially liable" under the liability provisions of CERCLA § 107(a). 42 U.S.C. § 9613(f); see also Concrete Sales and Servs., Inc. v. Blue Bird Body Co., 211 F.3d 1333, 1336 (11th Cir. 2000) ("Section 113(f) authorizes any person to seek contribution from any other person who is or may be liable under § 107(a) of CERCLA"). A PRP's right to contribution "is contingent upon an inequitable distribution of common liability among liable parties." Atlantic Research, 551 U.S. at 139. "[T]he court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1).

Faison also seeks contribution under O.C.G.A. § 23-2-71, which provides: "In cases of joint, joint and several, or several liability of two or more persons, where all are equally bound to bear the common burden and one has paid more than his share, he shall be entitled to contribution from the others ..." CERCLA liability is "joint and several." Mathis v. Velsicol Chem. Corp., 786 F. Supp. 971, 976 (N.D. Ga. 1991).

The Tuggles do not dispute that they are the owners of the Property. Nor do the Tuggles dispute the fact that releases occurred during their period ownership. The Tuggles nonetheless urge dismissal of the contribution claims on the ground that their equitable share of liability for the contamination is zero because Scarlett is the de facto owner of the Property. Alternatively, the Tuggles seek dismissal on the ground that they have been contractually indemnified by Scarlett.

As the admitted owners of the Property both now and when the disposals occurred, there is no question that the Tuggles are strictly liable for the contamination. 42 U.S.C. § 9607(a). Atlantic Research, 551 U.S. at 136 (quoting United States v. Alcan Aluminum Corp., 315 F.3d 179, 184 (2d Cir. 2003)); Briggs & Stratton Corp. v. Concrete Sales & Servs., 20 F. Supp. 2d 1356, 1366 (M.D. Ga. 1998) (citing United States v. R.W. Meyer, Inc., 889 F.2d 1497, 1507 (6th Cir. 1989) and United States v. Monsanto Co., 858 F.2d 160, 168 (4th Cir. 1988)). The Court is aware of no case offering liability protection to "absentee" owners, like the Tuggles, even

when the "absentee" owners had no direct involvement in causing contamination. To the contrary, CERCLA does not sanction "willful or negligent blindness on the part of absentee owners." <u>Monsanto</u>, 858 F.2d at 169; <u>see also</u> <u>Metropolitan Water Reclamation District of Greater Chicago v. North American Galvanizing & Coatings, Inc.</u>, 473 F.3d 824, 829 (7th Cir. 2007) ("an absentee landowner may be liable under § 107(a) for the full cost of remedying a hazardous site....").

Further, although CERCLA permits private parties to contractually allocate their liability to each other, the statute provides that a contractual indemnity shall not relieve an owner of contaminated property of its CERCLA liability to third parties. 42 U.S.C. § 9607(e)(1) ("no indemnification, ... shall be effective to transfer from the owner ... to any other person the liability imposed under this section."). As Judge Posner wrote for the Seventh Circuit, "We agree with every other appellate court that has been called on to interpret [CERCLA §9607(e)] that it does not outlaw indemnification agreements, but merely precludes efforts to divest a responsible party of his liability." <u>Harley-Davidson, Inc. v. Ministar, Inc.</u>, 41 F.3d 341, 342-43 (7th Cir. 1994).

Based on the foregoing authorities, if Faison ultimately is found liable for violations of CERCLA and HSRA, Faison would be entitled to contribution from the Tuggles, notwithstanding the fact that Faison can also seek an equitable contribution from Scarlett. In allocating response costs among liable parties, the Court will take into consideration that Scarlett is the <u>de facto</u> owner of the Property, that the Tuggles have not actively contributed in any way to the contamination, and that Scarlett has indemnified the Tuggles. However, even these factors do not reduce the Tuggles' proportionate share of liability to zero, as they are still the admitted legal owners of the Property, have been the legal owners of the Property throughout the entire period of contamination, and have received monthly lease payments on the Property for decades, which were generated by operations known for causing environmental harm. Accordingly, the Court denies the Tuggles summary judgment with respect

to the contribution claims asserted under 42 U.S.C. § 9613(f) and O.C.G.A. § 23-2-71, and the Court will allocate response costs, as necessary, following a determination of Faison's liability under CERCLA and HSRA.

### C. Contribution Claim Under O.C.G.A. § 51-12-32

The Tuggles finally seek summary judgment on Faison's contribution claim under O.C.G.A. § 51-12-32. This statute provides for "contribution among several trespassers just as if the action had been brought against them jointly" and "[i]f judgment is entered jointly against several trespassers and is paid off by one of them, the others shall be liable to him for contribution." O.C.G.A. § 51-12-32(a), (b). In this case, the Tuggles are not trespassers; rather, the Tuggles are fee simple owners of the Property. It is well-settled that "no man can trespass upon his own property." Gilreath v. State, 96 Ga. 303, 22 S.E. 907 (1895). Because Faison's claim for contribution under O.C.G.A. § 51-12-32 fails on its face, the Tuggles are entitled to summary judgment on this claim as well.

## V.  CONCLUSION

For the reasons set forth above, the Court **GRANTS in part** and **DENIES in part** Defendant Faison & Associate, LLC's Motion for Summary Judgment [Doc. No. 151], **DENIES** Plaintiff's Motion for Leave to Amend Complaint [Doc. No. 160], **GRANTS in part, DENIES in part,** and **DENIES AS MOOT in part** Third-Party Defendants' Combined Motion for Summary Judgment [Doc. No. 161], and **DENIES** Plaintiff's Cross-Motion for Partial Summary Judgment [Doc. No. 164].

SO ORDERED this 30th day of September, 2009.


s/  CLARENCE COOPER

CLARENCE COOPER
SENIOR UNITED STATES DISTRICT JUDGE